# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| KRISTY WAGNER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:16-cv-00568-EGS |
| | ) | Filed Under Seal |
| AKIN GUMP STRAUSS | ) | |
| HAUER & FELD, LLP | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## AMENDED COMPLAINT

Plaintiff Kristy Wagner, by and through her counsel, GREEN & FOUSHEE and Iris McCollum Green, Esquire, hereby submits this Amended Complaint against Defendant Akin Gump Strauss Hauer & Feld LLP, and alleges as follows:

### I.     Jurisdiction

This action is brought for:

Discrimination in employment pursuant to: the District of Columbia Human Rights Act, as codified D.C. Code § 2-1402 (the "DCHRA"); the Americans with Disabilities Act of 1990, as codified 42 U.S.C. § 12101 et seq. (the "ADA"); Title VII of the Civil Rights Act of 1964, as codified 42 U.S.C. § 2000e et seq. (the "Civil Rights Act"); and the Equal Pay Act, as codified 29 U.S.C. § 206(d) (the "Equal Pay Act");

Intentional infliction of emotional distress under Washington, D. C. common law;

Invasion of Privacy under Washington, D. C. common law; and Tortious interference with contracts and economic expectancy under Washington, D. C. common law.

II.    **Facts**

1.   Plaintiff Kristy Wagner is a resident of the State of New York and is over the age of twenty-one.

2.   On June 27, 2011, Defendant offered Plaintiff employment as an attorney with the title of "Counsel" in Defendant's Washington, D. C. office.

3.   Plaintiff commenced employment at Defendant's Washington, DC office in July of 2011.

4.   Plaintiff's practice group leaders at Defendant's firm were equity partners Adam Umanoff ("Umanoff") and Edward Zaelke ("Zaelke").

5.   In addition, Plaintiff had substantial entertainment experience and led entertainment asset sale and entertainment financing transactions, and furthered business relationships with entertainment financiers, on behalf of Defendant.

6.   On October 8, 2011, Plaintiff was seriously injured in a zip-lining accident.

7.   Umanoff and Zaelke were notified on October 8, 2011 of Plaintiff's ziplining accident and the injury that resulted to her leg.

8.   The injury that resulted from Plaintiff's October 8, 2011 ziplining accident limited Plaintiff's ability to ambulate, required four separate surgeries and a multitude of procedures and treatments, and caused swelling and pain if Plaintiff walked for any length of time or sat for longer than an hour.

9.   During post-injury and post-operative recovery periods while working for Defendant, Plaintiff was instructed by her surgeons not to bear weight for months at a

time, to elevate her leg above the level of her heart throughout the day, and to ice her leg throughout the day.

10. On or about October 8, 2011 and during post-operative periods while working for Defendant, Plaintiff requested from Umanoff an accommodation to work from home.

11. Umanoff approved the accommodation on or about October 8, 2011 and during post-operative periods thereafter while Plaintiff worked for Defendant.

12. In 2013, Plaintiff was told by Umanoff that she was eligible, and being considered, for partnership at Defendant's firm.

13. In late October 2013, Plaintiff was told by Umanoff that she would not be promoted to partner at Defendant's firm in 2013.

14. When informing Plaintiff that she would not be promoted in late October 2013, Umanoff stated that – had Plaintiff been present in Defendant's office – she would have been promoted to partner in 2013.

15. In late October of 2013, Plaintiff was instructed by Umanoff to do the following to ensure Plaintiff would be promoted to partner at Defendant's firm in 2014: physically work in Defendant's Washington, DC office or Manhattan office and engage in business travel, among other things.

16. Fearing she would not be promoted to partner at Defendant's firm in 2014 if she did not do so, Plaintiff followed Umanoff's instructions even though they constituted a denial of Plaintiff's reasonable accommodation to work from home.

17. In December of 2013, on behalf of Defendant, Plaintiff led a transaction for a client of Defendant's firm that was originated by partner Scott Heimberg ("Heimberg") and became friendly with Heimberg while doing so.

18. In 2014, Plaintiff was told by Umanoff that she was eligible, and being considered, for partnership at Defendant's firm.

19. In May 2014, Plaintiff communicated to Umanoff her concern that Plaintiff's non-promotion in 2013 was the result of gender discrimination.

20. On or about October 2, 2014, Zaelke had one or more discussions with John Ha ("Ha"), a non-disabled male attorney, about rejoining Plaintiff's renewable energy practice group.

21. Ha was never considered for partnership at Defendant's firm and was not stated in either of Plaintiff's 2013 or 2014 partnership memoranda to be worthy of partnership consideration at Defendant's firm in the future.

22. Ha's annual compensation upon rehiring by Defendant in 2014 was higher than Plaintiff's annual compensation at Defendant's employ.

23. Ha's title upon rehiring by Defendant in 2014 was "Senior Counsel".

24. Defendant at no point offered Ha's 2014 title or compensation to Plaintiff.

25. In late October 2014, Plaintiff was once again told by Umanoff that she would not be promoted to partner at Akin Gump Strauss Hauer & Feld LLP.

26. When notifying Plaintiff of the 2014 non-promotion, Umanoff stated that the firm was not going to "protect" her and that she would be the "sacrificial lamb".

27. Mere days after Plaintiff learned of the 2014 non-promotion in October 2014, Zaelke phoned Plaintiff on her cellular phone to ask Plaintiff when she would be leaving Defendant's employ.

28. By mid to late October 2014, Plaintiff had no choice but to resign her position at Defendant's firm since the work environment had become so unbearable for Plaintiff to mentally and physically withstand.

29. Plaintiff was offered employment at Duane Morris LLP, as a partner, and commenced employment in Duane Morris' Washington, DC office in late October 2014.

30. On February 22, 2015, Plaintiff texted Heimberg that she would soon be making a claim with the Equal Employment Opportunity Commission ("EEOC").

31. Within days of Plaintiff's texts to Heimberg stating that she would be making a claim with the EEOC, Defendant contacted Duane Morris' General Counsel, Michael Silverman ("Silverman"), with regard to Plaintiff.

32. Defendant communicated to Duane Morris that Defendant would be commencing legal action against Plaintiff and alerting the Federal Bureau of Investigation, the Washington Metro Police and the Los Angeles Police Department.

33. In late February 2015, within days of Defendant's communication with Duane Morris, Silverman told Plaintiff she must either resign or she would be terminated because Defendant had communicated to Duane Morris that Defendant would be commencing legal action against Plaintiff and would be alerting the Federal Bureau of Investigation, the Washington Metro Police and the Los Angeles Police Department.

34. On February 26, 2015, 4 days after Plaintiff texted Heimberg that she would be making a claim with the EEOC, Defendant and Umanoff filed a Temporary Restraining Order application against Plaintiff in Los Angeles County (the "LA TRO").

35. On February 27, 2015, 5 days after Plaintiff's texted Heimberg that she would be making a claim with the EEOC, Defendant filed a Temporary Restraining Order application against Plaintiff in Washington, DC (the "DC TRO"; together with the LA TRO, the "TROs").

36. In March 2015, at Defendant's request, Plaintiff, while in a cast and ambulating on crutches, visited the office of Dr. Goldstein, an experienced psychiatrist selected by Defendant, to be examined by Dr. Goldstein.

37. During Dr. Goldstein's examination of Plaintiff in March 2015, after reviewing the TROs, text messages and emails provided by Defendant for his review, including the text messages that were quoted in the TROs, Dr. Goldstein issued a written report to Defendant stating that Plaintiff posed no threat of violence.

38. During Plaintiff's examination by Dr. Goldstein in March 2015, Dr. Goldstein stated to Plaintiff and Plaintiff's psychologist Dr. Laytrayal Simmons ("Dr. Simmons") that he strongly disagreed with Defendant's communication with Duane Morris regarding Plaintiff.

39. On March 18, 2015, Dr. Simmons issued a written report to Defendant, which stated that Plaintiff posed no threat to self or others.

40. In early June 2015, Plaintiff commenced her role as a partner in Polsinelli's Washington, DC office.

41. Thereafter, in June 2015, Plaintiff was terminated by Polsinelli LLP due to the TROs.

42. In July 2015, Plaintiff completed multiple rounds of interviews with NRG Energy for an attorney position that would focus on renewable energy matters.

43. Plaintiff was the strongest candidate for said NRG Energy renewable energy attorney job.

44. Thereafter, Plaintiff was told by NRG Energy that she would not be hired by NRG Energy.

45. An employee of NRG Energy stated that Plaintiff was not hired by NRG Energy because Defendant had communicated information regarding the TROs.

46. Defendant's discrimination, invasion of Plaintiff's privacy, and tortious interference with partnership roles and prospective employment resulted in the total loss of Plaintiff's career as a law firm partner and the loss of stable employment and income for a period of 4 years thereafter.

III.   Claims

A.  Disability Discrimination Under the ADA and DCHRA

47. Plaintiff repeats and realleges the factual allegations in this Amended Complaint as if fully set forth herein.

48. The injury that resulted to Plaintiff's leg on October 8, 2011 and the pain and mobility impairment that plagued her for more than 5 years thereafter clearly constitutes a disability that placed her in a protected class under the ADA and DCHRA.

7

49. From October 8, 2011 through March 2017, Plaintiff's leg disability substantially affected and limited major life activities, such as walking and working in-office, and required an accommodation.

50. The 2013 non-promotion of Plaintiff by Defendant violated the ADA and DCHRA in that it constituted discrimination against Plaintiff due to her disability and due to Plaintiff's accommodation of working from home.

51. Umanoff's late October 2013 instruction to Plaintiff to be present in Defendant's Washington, D. C., or Manhattan office and to engage in business travel constituted a denial of Plaintiff's reasonable accommodation to work from home.

52. By late 2014, Defendant's failure to accommodate Plaintiff's physical disability caused Plaintiff's leg to remain swollen, her surgical incision to begin reopening, and the pain to become so severe that Oxycodone was the only pain medication that provided Plaintiff with pain relief.

53. From and after January 1, 2012, through late February 2015, Plaintiff was qualified for her position and for the role of a law firm partner at Defendant's firm.

54. Plaintiff's 2012 employee review stated that she was operating as a partner and that – notwithstanding her major surgery and lengthy recovery - she still managed to take on a full complement of transactions and recorded among the highest billable hours in her practice group.

55. Plaintiff suffered an adverse employment action when Defendant failed to promote Plaintiff in 2013.

56. Plaintiff suffered an adverse employment action when Defendant failed to promote Plaintiff in 2014.

57. Plaintiff suffered an adverse employment action when she was not offered Ha's superior title or compensation on or after October 1, 2014.

58. Plaintiff suffered an adverse employment action when Plaintiff was constructively terminated by Defendant in late October 2014.

59. Plaintiff suffered an adverse employment action in late February 2015 when Plaintiff's partnership role at Duane Morris ended due to Defendant's communication to Duane Morris that Defendant would be commencing legal action against Plaintiff and alerting the Federal Bureau of Investigation, the Washington Metro Police and the Los Angeles Police Department.

60. Plaintiff suffered an adverse employment action in June 2015 when Polsinelli LLP terminated Plaintiff's partnership due to the TROs.

61. Plaintiff suffered an adverse employment action when she was not hired by NRG Energy after multiple interviews in July 2015 because Defendant communicated with NRG Energy regarding the TROs

62. No non-disabled Akin Gump Strauss Hauer & Feld LLP attorney experienced 6 adverse employment actions in 3 consecutive years.

63. No non-disabled Akin Gump Strauss Hauer & Feld LLP attorney suffered 2 consecutive non-promotions by Defendant's firm, constructive termination from Defendant's firm, a failure to be hired by a subsequent employer, and termination of partnership at 2 other law firms.

**B.  Gender Discrimination Under the Civil Rights Act and the DCHRA**

64. Plaintiff repeats and realleges the factual allegations in this Amended Complaint as if fully set forth herein.

65. As Plaintiff is a female, she is a member of a protected class.

66. Plaintiff suffered an adverse employment action when she was not promoted to partner at Defendant's firm in 2013.

67. Plaintiff suffered an adverse employment action when she was not promoted to partner at Defendant's firm in 2014.

68. Plaintiff suffered an adverse employment action when she was not offered Ha's superior title or compensation on or after October 1, 2014.

69. Plaintiff suffered an adverse employment action when she was constructively terminated by Defendant in late October 2014.

70. Plaintiff suffered an adverse employment action in late February 2015 when Plaintiff's employment at Duane Morris ended due to Defendant's communication to Duane Morris that Defendant would be commencing legal action against Plaintiff and alerting the Federal Bureau of Investigation, the Washington Metro Police and the Los Angeles Police Department.

71. Plaintiff suffered an adverse employment action in June 2015 when Polsinelli LLP terminated Plaintiff's partnership due to the TROs.

72. Plaintiff suffered an adverse employment action when she was not hired by NRG Energy after multiple interviews in July 2015 because Defendant had communicated information about the TROs.

73. Defendant treated Plaintiff differently from similarly situated male attorneys employed by Defendant.

74. Plaintiff's 2012 attorney review stated "Kristy is a star.  She runs deals with minimal supervision and operates at a partner level.  Clients view her as the Akin leader on her deals and routinely ask for her to be staffed on their matters.  She is among the hardest working lawyers [Umanoff has] ever worked with and client service is always her paramount concern.  During this evaluation period, she has major surgery and a lengthy recovery, yet still managed to take on a full complement of transactions (including outside of the project group when she had free time) and record among the highest billable hours in our group.  Her counseling skills are excellent, she does not miss key issues, is a skilled negotiator and incredibly rounded in terms of her experience."

75. In 2013, Plaintiff was similarly situated (if not superior) to all male partnership candidates who were promoted to partner at Defendant's firm in 2013.

76. In 2014, Plaintiff was similarly situated (if not superior) to all male partnership candidates who were promoted to partner at Defendant's firm in 2014.

77. From and after January 1, 2012 through late February 2015, Plaintiff was similarly situated (if not superior) to all male partners in her practice group at Defendant's firm with the exception of Umanoff.

78. No male Akin Gump Strauss Hauer & Feld LLP attorney experienced 6 adverse employment actions in 3 consecutive years.

79. No male Akin Gump Strauss Hauer & Feld LLP attorney suffered 2 consecutive non-promotions by Defendant, constructive termination from Defendant's firm, a failure to be hired by a subsequent employer, and the termination of partnership at 2 other law firms.

## C.  Discrimination In Pay Under the Equal Pay Act

80. Plaintiff repeats and realleges the factual allegations in this Amended Complaint as if fully set forth herein.

81. Plaintiff did substantially equal work on the job and Plaintiff's on-the-job skill, effort and responsibility were equal, if not superior, to all male partners in her practice group except for Umanoff.

82. Plaintiff was operating as a partner in 2012, was eligible for partnership at Defendant's firm in 2013 and 2014, was hired as a partner at Duane Morris in 2014, and was hired as a partner at Polsinelli in 2015.

83. Plaintiff performed her work at Defendant's firm under similar, if not substantially less favorable, working conditions as the male partners of Defendant.

84. As no male partner of Defendant's firm experienced 6 adverse employment actions in a consecutive 3 year period, Plaintiff's working conditions were immeasurably more mentally and physically taxing than the working conditions of male partners at Defendant's firm.

85. While Plaintiff was operating as a partner from 2012 through Plaintiff's constructive termination in late October 2014, male partners in Plaintiff's practice group had access to experienced associates within the practice group to assist them on transactions, while Plaintiff was often forced to look outside the practice group for associate assistance and/or use inexperienced associates within the practice group, which resulted in substantially more work for Plaintiff.

86. While Plaintiff was operating as a partner from 2012 through Plaintiff's constructive termination in late October 2014, Plaintiff was not allocated any funds for client or business development at Defendant's firm, which funds male partners at Defendant's firm had access to.

87. Plaintiff's highest annual compensation at Defendant's employ was less than that of Ha after he was rehired by Defendant as a non-partner in late 2014.

88. As Ha was never considered for partner at Defendant's firm and was not stated to be a potential candidate for partnership in the future in Plaintiff's 2013 or 2014 partnership sponsor memoranda, Ha did not do substantially equal work on the job as did Plaintiff and Plaintiff's on-the-job skill, effort and responsibility were superior to that of Ha.

89. At all times during Plaintiff's employ at Defendant's firm, Plaintiff was paid less than all full-time male partners in Plaintiff's practice group.

90. On information and belief, while at Defendant's employ, Plaintiff was paid less than all full-time partners at Defendant's firm.

**D. Retaliation under the ADA, the Civil Rights Act, and the DCHRA**

91. Plaintiff repeats and realleges the factual allegations in this Amended Complaint as if fully set forth herein.

92. Shortly after the October 2013 non-promotion, Plaintiff engaged in protected activity when she requested to Umanoff that she be transferred out of her practice group into another transactional practice group, in an attempt to remove herself from the unlawful and abusive environment that persisted within Plaintiff's practice group.

93. In the weeks and months after the 2013 non-promotion, Plaintiff engaged in a protected activity when she complained to partners Heimberg and Kerry Berchem about the discriminatory treatment and untenable work environment Plaintiff was experiencing.

94. Plaintiff engaged in a protected activity when she opposed the 2013 non-promotion to Umanoff in May 2014 on the grounds of gender discrimination.

95. A materially adverse action occurred thereafter when Defendant failed to promote Plaintiff in 2014.

96. Plaintiff engaged in a protected activity when she texted Heimberg on February 22, 2015 that she would soon be filing a claim with the EEOC.

97. Plaintiff's February 22, 2015 texts to Heimberg made reference to a period of 10 days.

98. Within 10 days of receiving Plaintiff's claim, the EEOC was required to provide a copy of it to Defendant.

99. A materially adverse action occurred within days of Plaintiff's February 22, 2015 texts to Heimberg that she would be making a claim with the EEOC, when Plaintiff was forced to resign from Duane Morris (on the threat of termination) because Defendant communicated to Duane Morris that Defendant would be commencing legal action against Plaintiff and alerting the Federal Bureau of Investigation, the Washington Metro Police and the Los Angeles Police Department.

100.     A materially adverse event occurred when, on February 26, 2015, 4 days after Plaintiff texted Heimberg that she would be making a claim with the EEOC, Defendant filed an unsealed Temporary Restraining Order application in LA which referenced Plaintiff's non-promotion.

101.     A materially adverse event occurred when, on February 27, 2015, 5 days after Plaintiff texted Heimberg that she would be making a claim with the EEOC, Defendant filed a sealed Temporary Restraining Order application against Plaintiff in Washington, DC.

102.     A materially adverse event occurred when Plaintiff's partnership was terminated by Polsinelli LLP in June 2015.

103.     A materially adverse event occurred when NRG Energy failed to hire Plaintiff in July 2015.

104.     The temporal proximity of mere days between Plaintiff's activity in texting Heimberg that she would soon be filing a claim with the EEOC and Plaintiff's loss of her partnership at Duane Morris and the filing of the TROs clearly demonstrates causation.

105.     Any one of the materially adverse actions described in this Amended Complaint would dissuade a reasonable worker from making a charge of discrimination.

106.    *All six of the material adverse actions described in this Amended Complaint –*
*taken together – have enabled law firms like Defendant to get away with decades-long*
*discrimination.*

### E.  Intentional Infliction of Emotional Distress

107.    Plaintiff repeats and re-alleges the factual allegations in this Amended
Complaint as if fully set forth herein.

108.    Subjecting Plaintiff to 6 adverse employment actions in a 3 year period is
undoubtedly extreme and outrageous conduct by Defendant, especially in light of
Plaintiff's favorable attorney reviews and sponsor memoranda at Defendant's employ
that stated she was operating as a partner in 2012.

109.    What makes Defendant's actions and inactions even more extreme and
outrageous is that when informing Plaintiff of the 2014 non-promotion, Umanoff,
Plaintiff's practice group leader who had authority over her, stated to Plaintiff that no
one was going to "protect" her and that she would be the "sacrificial lamb".

110.    A reasonable worker being told by their boss that they would not be
promoted a second year in a row and that no one was going to protect him or her and
that he or she would be the sacrificial lamb, would deeply fear the loss of his or her job,
if not far worse.

111.    In late 2015 correspondences to Heimberg, her closest confidante while working for Defendant's firm, Plaintiff analogized her circumstances to swimming in a shark tank and to being disposed of like trash.

112.    Failing to desist negatively impacting Plaintiff's career when Defendant had actual knowledge through Plaintiff's correspondences that Plaintiff's emotional state was severely deteriorating, was extreme and outrageous.

113.    Causing Plaintiff to lose her partnership at Duane Morris, where she went to escape the mental anguish caused by the actions and inactions of Defendant, utilizing private texts that Plaintiff sent to her closest confidante while working for Defendant's firm, after Plaintiff suffered consecutive non-promotions at Defendant's employ, is unconscionable.

114.    Defendant did not stop its horrific behavior after causing Plaintiff to lose her partnership at Duane Morris.  On multiple occasions in 2015, before Plaintiff commenced litigation against Defendant, Defendant continued to intentionally prevent Plaintiff from obtaining or maintaining any legal job including by causing Plaintiff not to be hired by NRG Energy and causing Plaintiff's partnership at Polsinelli to be terminated.

115.    Indicative of the egregious nature of Defendant's actions are the statements of those who knew of Defendant's treatment of Plaintiff.

116.     The former Vice President and General Counsel of a client that was shared by both Defendant and Plaintiff stated to Plaintiff that he had been experiencing the "5 stages of grief" because of Plaintiff's 2014 non-promotion.

117.     Sheila Hollis, Chair of Duane Morris' Washington, DC office, described Defendant's treatment of Plaintiff as "unconscionable" and "egregious".

118.     Defendant's intentional or reckless conduct can be inferred from the outrageousness of the conduct described in this Amended Complaint.

119.     Defendant's actions and inactions in causing the 6 adverse employment actions described in this Amended Complaint were reckless, if not intentional.

120.     Defendant's actions and inactions in subjecting Plaintiff to an adverse employment action when Defendant failed to promote partner in 2013 were intentional.

121.     Defendant's actions and inactions in subjecting Plaintiff to an adverse employment action when Defendant failed to promote partner in 2014 were intentional.

122.     Defendant's actions and inactions in causing Plaintiff to lose her partnership at Duane Morris were reckless, if not intentional.

123.     Defendant's actions and inactions in referencing Plaintiff's non-promotion in an unsealed TRO filed in LA County were intentional.

124.     Defendant's failure to fairly compensate Plaintiff was reckless, if not intentional.

125.     Defendant's actions in preventing Plaintiff from being hired by NRG Energy were reckless, if not intentional.

126.     Defendant's actions in causing Plaintiff to be terminated from her partnership at Polsinelli were reckless, if not intentional.

127.     Defendant's actions and inactions described in this Amended Complaint undoubtedly caused Plaintiff severe emotional suffering.

128.     Job loss is traumatic and devastating for most people who experience it.

129.     Plaintiff experienced job loss, constructive or otherwise, 3 times over the course of 8 months.

130.     Indicative of Plaintiff's emotional distress is that, in March 2015, Plaintiff's psychologist Dr. Laytrayal Simmons diagnosed Plaintiff with Adjustment Disorder with mixed disturbance of emotion and conduct, because Plaintiff had exhibited emotional and behavioral symptoms in response to the failure to attain occupational goals, termination from her job, and hostile work environment at Defendant's firm.

131.     In the months and years after the 2014 non-promotion, Plaintiff suffered from mental health issues that Plaintiff had not previously exhibited symptoms of, nor had she been diagnosed with, as of the 2014 non-promotion, including Post Traumatic Stress Disorder, Anxiety and Bipolar Disorder.

132.     Plaintiff's severe and mounting emotional distress was so acute that, in 2015, Plaintiff experienced noticeable weight loss, extreme and uncharacteristic hair loss for which she sought medical advice, and the reopening of Plaintiff's leg incision from a prior surgery due to her inability to care for her disabled leg.

133.     In November of 2015, Plaintiff's severe emotional distress caused Plaintiff's seven-year relationship with her partner to end.

134.     In early 2016, Plaintiff was unable to support herself monetarily and emotionally, which caused Plaintiff to move back into Plaintiff's childhood home with her parents.

135.     By July of 2016, Plaintiff's mental state had declined to the point of Plaintiff being admitted to Zucker Hill Psychiatric Hospital.

**F.  Invasion of Privacy**

136.     Plaintiff repeats and re-alleges the factual allegations in this Amended Complaint as if fully set forth herein.

137.     Defendant did not disclose to clients or the public the names of the other attorneys who suffered a non-promotion in 2013.

138.     Defendant did not disclose to clients or the public the names of the other attorneys who suffered a non-promotion in 2014.

139.     Plaintiff had a reasonable expectation that her 2013 and 2014 non-promotions would be kept and remain private.

140.     Defendant violated Plaintiff's privacy when Umanoff alerted one of more firm clients that Defendant failed to promote Plaintiff in October of 2013.

141.     Defendant violated Plaintiff's privacy when Umanoff alerted one of more firm clients that Defendant failed to promote Plaintiff in October of 2014.

142.     Defendant violated Plaintiff's privacy when Zaelke informed Ha that Plaintiff would not be and/or had not been promoted to partner in 2014.

143.     Defendant violated Plaintiff's privacy when Zaelke, Umanoff, and firm attorney Robert Humphreys ("Humphreys") referenced Plaintiff's non-promotion in an unsealed TRO application filed in LA County in February 2015.

144.     A reasonable person would find it highly offensive for their employer and/or their prior bosses to tell a non-employee and/or a client of their failure to be promoted.

145.     A reasonable person would find it egregious for their prior employer and/or their prior bosses to state in an unsealed temporary restraining order application that their prior employer failed to promote them.

146.     The fact that Plaintiff was not promoted by Defendant is not a legitimate public concern.

147.     Defendant would have informed clients or publicly stated the names of the other attorneys who were not promoted in 2013 or 2014 if an attorney's non-promotion was a legitimate concern to the public.

148.     Defendant violated Plaintiff's privacy when the firm's General Counsel Barry Chasnoff, Umanoff, Zaelke, and Humphreys reviewed private and personal text

messages from Plaintiff's cellular phone to Heimberg's cellular phone after Plaintiff's constructive termination in late October 2015.

149.     On February 22, 2015, Plaintiff had a reasonable expectation that text messages sent from her cellular phone to the cellular phone of her closest confidante while at Defendant's employ would remain private as had prior texts from Plaintiff to Heimberg.

150.     While both were working for Defendant's firm, Heimberg and Plaintiff confided in one another about private matters, Heimberg about marital issues and Plaintiff that Umanoff's and Zaelke's treatment of her had caused her to begin interviewing at other law firms due to the untenable work environment that ensued after Plaintiff's 2013 non-promotion.  In Plaintiff's February 22, 2015 texts to Heimberg, Plaintiff stated that she knew that emails to and from Akin Gump were being censored, but she did not say the same about text messages because she believed them to be private and unmonitored.

151.     At no point did Heimberg respond to Plaintiff with a text stating that Plaintiff's texts were being monitored nor did he respond with a text stating that Defendant, Umanoff, Zaelke, Humphreys or anyone else would be privy to the texts Plaintiff sent only to Heimberg.

152.     At no point did Plaintiff state to Heimberg that she desired for her text messages to be read by Defendant, Umanoff, Zaelke, Humphreys, or anyone else.

153.     Defendant, Umanoff, Zaelke, and Humphreys not only read Plaintiff's personal texts to Heimberg but they publicly disseminated Plaintiff's personal texts to

Heimberg when Defendant, Umanoff, Zaelke and Humphreys filed an unsealed

Temporary Restraining Order application in LA County in which Plaintiff's personal

texts to Heimberg were quoted.

154.     Defendant disseminated Plaintiff's private facts when communicating to

Plaintiff's then employer Duane Morris that it would be taking legal action against

Plaintiff and subsequently filing an unsealed TRO application which referenced

Plaintiff's non-promotion and the substance of Plaintiff's February 22, 2015 personal

texts to Heimberg.

155.     A reasonable person would be horrified if their prior employer

communicated to their then-current employer that they would be taking legal action

against their prior employee and referenced the Federal Bureau of Investigation, the

Washington DC Metro Police and the Los Angeles County Police Department during

said communication.

156.     Even Dr. Goldstein, the psychiatrist hired by Defendant to examine

Plaintiff, found it highly objectionable that Defendant communicated with Duane

Morris about Plaintiff.

157.     The unsealed LA TRO application filed against Plaintiff placed Plaintiff in

a false light.

158.     Defendant's communication to Duane Morris, Polsinelli, and NRG Energy

regarding the TROs placed Plaintiff in a false light.

159.     Defendant, Umanoff, Zaelke, and Humphreys placed Plaintiff in a false

light when they failed to seal the LA TRO in March 2015 after (a) Dr. Goldstein, a

psychiatrist selected and hired by Defendant to examine Plaintiff and review the texts cited in the TROs and other communications provided by Defendant, stated in a written report delivered to Defendant that Plaintiff at no point posed a threat; and (b) Dr. Simmons, Plaintiff's psychologist, issued a written report to Defendant stating Plaintiff was not a threat to herself or others.

160.    The LA TRO quoted Plaintiff's personal texts to Heimberg and only Heimberg and referenced the Federal Bureau of Investigation, the Washington Metro Police Department, and the Los Angeles Police Department in an attempt to portray Plaintiff as a violent criminal.

161.    Plaintiff is not a violent criminal and in fact has no criminal record.

162.    Defendant, Umanoff, Zaelke and Humphreys knew Plaintiff was not a violent criminal as Plaintiff would not have been considered for partnership at Defendant's employ had she been a violent criminal.

163.    Defendant, Umanoff, Zaelke and Humphreys knew Plaintiff's February 22, 2015 texts to Heimberg were not threatening physical harm as said texts stated that Plaintiff: "wouldn't go near either of them with a 900 foot pole".

164.    Defendant, Umanoff, Zaelke and Humphreys knew Plaintiff's February 22, 2015 texts to Heimberg were not threatening harm as, on February 24, 2015, prior to the filing of the TROs, Plaintiff texted Heimberg that she withdrew all of her texts to Heimberg, stating that their sole purpose was to show Heimberg that she was on to Zaelke's (discriminatory) scheme, that the texts could not otherwise be taken seriously, and that the texts had no effect.

165.     Dr. Goldstein stated in a written report to Defendant in March 2015 that Plaintiff was not a threat and that her texts were the result of Plaintiff consuming Oxycodone, which was prescribed by her surgeon to lessen the pain that her leg disability caused her.

166.     A reasonable person with no criminal record would be outraged if their prior employer and/or prior bosses portrayed them as a violent criminal in publicly available temporary restraining order filings.

167.     Defendant's, Umanoff's, Zaelke's and Humphreys' invasion of Plaintiff's privacy caused Plaintiff to suffer an irreparable blow to her pristine reputation, severe mental distress, humiliation, the loss of stable employment for 4 years thereafter, and the permanent loss of her career as a law firm partner.

**G.  Tortuous Interference**

168.     Plaintiff repeats and re alleges the factual allegations in this Amended Complaint as if fully set forth herein.

169.     Plaintiff, who joined Duane Morris in 2014 as a partner, had a valid contractual relationship with Duane Morris.

170.     Upon joining Duane Morris in late 2014, Plaintiff signed Duane Morris' Partnership Agreement.

171.     Defendant knew of the contractual relationship between Plaintiff and Duane Morris since, in late 2014, Duane Morris' General Counsel, Michael Silverman, contacted Barry Chasnoff, Defendant's General Counsel, requesting Defendant to send Plaintiff's client records to Duane Morris.

172.     Defendant also knew of Plaintiff's contractual relationship with Duane Morris since Defendant's partners and Plaintiff were working on client matters across firms in late 2014 and Plaintiff's signature on her Duane Morris emails to Defendant's partners stated both that she worked at Duane Morris and that she was a partner there.

173.     Defendant intentionally interfered with Plaintiff's contractual relationship with Duane Morris when, in late February 2015, Defendant communicated to Silverman that Defendant would be commencing legal action against Plaintiff and alerting the Federal Bureau of Investigation, Washington DC Metro Police and the Los Angeles Police Department.

174.     Defendant's intentional interference caused a termination of the relationship between Plaintiff and Duane Morris when, within days thereafter, Silverman stated that, because of Defendant's communication that Defendant would be commencing legal action and alerting the Federal Bureau of Investigation, Washington DC Metro Police and the Los Angeles Police Department, Plaintiff must either resign or she would be terminated by Duane Morris.

175.     On or about June 1, 2015, Plaintiff joined Polsinelli LLP as a partner in Polsinelli's Washington, D. C. office.

176.     Plaintiff had a valid contractual relationship with Polsinelli since it signed Polsinelli's Partnership Agreement on or about June 1, 2015.

177.     One or more attorneys of Defendant learned of the contractual relationship between Plaintiff and Polsinelli including through Plaintiff's LinkedIn Profile.

178.     Plaintiff was terminated in June of 2015 due to the TROs.

179.     Plaintiff suffered resultant damage when she lost her partnership role and employment at Polsinelli.

180.     In July 2015, Plaintiff completed multiple rounds of interviews with NRG Energy for an attorney position focusing on renewable energy matters.

181.     Plaintiff was fully qualified for the renewable energy attorney position at NRG Energy and had a valid, existing economic expectancy from employment with NRG Energy.

182.     Defendant knew of Plaintiff's economic expectancy from NRG Energy.

183.     Defendant intentionally interfered with Plaintiff's economic expectancy of employment with NRG Energy when Defendant communicated information to NRG Energy about the TROs.

184.     As a result thereof, an employee of NRG Energy communicated to Plaintiff that it would not be hiring Plaintiff.

185.     Plaintiff suffered resultant damage when she was unable to obtain employment at NRG Energy for an attorney position for which Plaintiff was fully qualified.

186.     Defendant's tortious interference with Plaintiff's economic expectancy of employment with NRG Energy caused Plaintiff to suffer the pecuniary loss of the benefits of employment with NRG Energy, which was commercially reasonable to expect, and consequential losses for which the interference is the legal cause.

187.     Defendant's tortious interference with her Duane Morris partnership, her Polsinelli partnership, and her economic expectancy of employment with NRG Energy, caused Plaintiff resultant damage in that it left her without stable employment for 4 years thereafter and the permanent loss of her career as a law firm partner.

## IV.   Exhaustion of Federal Administrative Remedies

Plaintiff filed a charge with the Equal Employment Opportunity Commission regarding Defendant's discriminatory conduct prior to the commencement of the instant litigation and the Equal Employment Opportunity Commission issued a Notice of Right to Sue Letter after the Plaintiff commenced the instant litigation on a *pro se* basis.

## V.  Relief Sought

Plaintiff seeks (1) actual, putative and compensatory damages including for Plaintiff's past suffering including mental anguish and severe emotional distress; (2) lost past, present and future compensation and benefits; (3) consequential losses; and (4) other damages and remedies that the Court deems just and proper.

## VI.  Certification and Closing

Under the Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this Amended Complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely

have evidentiary support after a reasonable opportunity for further investigation or

discovery; and (4) this Amended Complaint otherwise complies with the requirements

of Rule 11.

Respectfully submitted by:

GREEN & FOUSHEE

By:

/s/ Iris McCollum Green
IRIS McCOLLUM GREEN, ESQUIRE
D.C. Bar No. 932590
1714 15th Street, N.W., Suite B
Washington, D.C. 20009
(202) 785-1171
iriseagain@aol.com

## CERTIFICATE OF SERVICE

I, hereby, state that on this 21st day of March 2024, a copy of Plaintiff's amended complaint out of time was served on all counsel of record by efiling through the court's electronic filing system, ECF.

/s/ Iris McCollum Green
Iris McCollum Green, Esquire